Thank you, Your Honor. Good morning. Eileen Dennis Gilbride from Phoenix, Arizona for the Plaintiff. Counsel, the acoustics in here are not that great. Something about the shape of the courtroom and your voice and the acoustics aren't a real good match. A lot of lawyers, their voices are just hard for us to make out the words, so you'll want to pay attention to us, see if we understand you. Yes, sir. I'll speak up. Is that better? Thanks. Your Honor, Eileen Gilbride for the Plaintiff. Stuart Marcus. Your Honor, we're compelled to view the facts of this case with every inference in favor of the plaintiff. And yet that's not what the district court did, and that is not what the defendant does in its answering brief. Further, both the lower court and defendant improperly resolved factual issues in favor of the defendant. Viewed properly, the evidence shows that Stuart Marcus, a disabled Jewish man, was fired from Phelps Dodge because of his disability or because he was regarded as disabled. Counsel, let me ask you a couple of questions. Yes, sir. On the disability. Yes, sir. Did Mr. Marcus ever tell his supervisor or others in the company that he had obsessive compulsive disorder and request some sort of accommodation for it? He did tell them that he had OCD. He did not request accommodation for it. After he told his supervisor, Mr. Replogle at the time, that he had OCD, very shortly thereafter he was asked to see an industrial psychologist who was by the name of Amber, I believe. And he did, in fact, go see this industrial psychologist. The industrial psychologist told him that he had an anxiety disorder that had the symptoms of OCD. After that, Mr. Marcus went to see his own psychologist at the industrial psychologist's suggestion, who did indeed diagnose him with OCD, and that is at ER 331. Dr. Mardoch did diagnose him with OCD. Our expert, Wilson, also avowed that Marcus has an anxiety disorder with the symptoms of OCD. That's at ER 325. So, and Dr. Wilson avowed at ER 329 that this disorder, quote, would significantly interfere with his occupational and social functioning. Why wouldn't it be incumbent on him to ask for some different job that would not require as much interaction? It's not incumbent on the employee to do that, Your Honor. There's a case, and I believe it is called Humphrey v. Memorial Hospital. It's out of this court, 2001. The employer has the duty to explore further methods of accommodation before terminating him. That case held that it's not the employer's, the employee's fault if he doesn't first request accommodation. I don't, frankly, I don't remember, Humphrey, but I don't understand what the boss is supposed to do. What he's not supposed to do is terminate him because of his relationships with others. Wait, from the boss's point of view, you've got a supervisor and the people under him are complaining about him. Yes. He's not getting along. Right. You're not a psychiatrist. You're a psychologist. You're a boss in an industrial company. I don't understand how you're supposed to know or what you're supposed to do. Well, he did send him to the psychologist. Psychologists tell the boss what to do? The psychologist came back and said, this guy has some problems. He told him to go to see his own psychologist to get some treatment. He did get treatment. Mr. Marcus told his boss that he went to get treatment, that he has OCD. And within not too long after that, his pay raise was withheld. When Pilotti ---- Look, if you would, I don't think I'm getting my question across. Sorry. If somebody had told me that they had OCD before I reviewed for this case, I would have thought another meaningless acronym, three initials. I have no idea what you mean. I have no idea what I'm supposed to do about it. There's evidence in the record, Your Honor, that they had several meetings. Marcus had several meetings with his supervisors about his interactions and his problems interacting with others. And it was in that context that he told him, well, I have OCD and I'm trying to do something for it. I'm going to see a psychologist. I'm getting medication. And so there's no suggestion in the record that his supervisor didn't know what OCD was or didn't know what the symptoms were or how it was manifesting itself. Let me ask you the other thing on my mind. Yes. Reading the record in this case, the anti-Semitic remarks bothered me. It looked like there were some anti-Semitic people there. Yes, sir. However, it looked like his boss, Marcus's boss, was actually protecting him from them rather than ramming them down his throat. And about the closest you got to anything about Marcus's boss was he laughed at his boss's joke. It didn't strike me as enough to show that Marcus was fired because of anti-Semitism. It's more than that, Your Honor, because it's a corporate culture of anti-Semitism. And as you may or may not realize, and I realize it in law firms too, the corporate culture comes down from the top. And his boss was at that meeting where Yearly made the anti-Semitic comment. Anti-Semitic comments were made not irregularly. Oh, the lawyer who got in an accident, he must have been a Jew. You want time off for the high holidays? That makes me uncomfortable. You know, this person who wants a job in the tax department, I don't know if you can do that. You have to work on Fridays and Saturdays. Didn't Marcus's boss tell the guy who kept making the cracks, you shouldn't do that, it offends Marcus? That's what he testified to. But he didn't follow up. He didn't investigate. He didn't go back and tell Marcus, I've taken care of this. He goes, oh, gee, I'm sorry, I didn't even realize it was anti-Semitic. That's the corporate culture that was involved. Boy, that offended you? I thought it was funny. You know, yeah, I'll talk to Yearly, but I'm not going to do anything more to follow up on it. What's the best evidence you have of nexus, though? Assuming, for the sake of argument, of a corporate culture, he did work there for 12-plus years. He was hired, although he was Jewish. He worked there. He received regular reviews. So what's your best evidence that there was a nexus between the culture and his termination? Here it is. At the luncheon where Yearly made the comment, that was in December of 99. Marcus complained about that when he submitted his diversity report, also in December of 99, and said, you people just don't have a commitment to diversity. One month later, in January of 2000, he had his pay raise withheld. And slightly later on that year, in November of 2000, so that's one month later, in November of 2000, he complained about the pack matches to the temple not being made. And in two months after that, he got a lower valuation in January of 2001. That was only two months later. The lowest of any senior executive, and he was fired four months later. I think that's enough, Your Honor, at least to go to the jury. Well, I guess I was being a little more specific. I understand that. But is there anything besides that that shows that the termination, as opposed to these other activities, was involved, whether there was some nexus between that and religious affiliation? And part of the problem is that the judge, the trial court judge, didn't let us do any discovery on how other executives who were fired or terminated were treated. Because the trial judge made the decision that those people weren't similarly situated without even allowing discovery on the issue. So Marcus has said in his, it's either in deposition or in his affidavit, that in his view he remembers, because he was in the HR business, that these people all had better terms for their severance agreements than he did. And this gets to the breach of contract action, how he said that the company says that he was not entitled to fully paid up life insurance or long-term disability. In his memory, those people did get those things. And so because the trial judge didn't allow discovery on it, it was difficult for us to make that showing that non-Jews were treated more favorably than he was. Let me switch gears and go back to a follow-up on a question that Judge Kleinfeld had. And that is under Humphrey. You cite Humphrey for the notion that there is a duty on the part of the employer to make an accommodation. And it does say that. When an employer becomes aware of a need for accommodation. Yes. So what was the accommodation that was required in this case? And when did the employer become aware of the need for that accommodation? The employer became aware of the problem right away. I understand your answer on OCD. Yes. But what accommodation was necessary to accommodate the OCD? Well, if you look at ER 386, that is a employment review where the company said he's technically competent, he's analytical, he's great, he cannot function when you interact with people. And it said that he would do well in the union negotiation aspect of the case, of his job, but not in the human relation aspect of it. And if they had given him duties that involved negotiation, the labor negotiation type of things, he would have succeeded in that because that's what they said he did best. So your view is the accommodation to the employer at that juncture should have switched his job duties and that was the accommodation required? They should have not had him in a function that required relating with subordinates and employees because that's why they fired him and did not offer him alternative employment, because he could not get along with people in his job. And if he was limited to the negotiation aspect and the labor aspect, he probably wouldn't have been fired because of it. All of his low evaluations were because of his disability, the OCD, or because he was regarded as disabled in that regard. I think we've covered. I guess the hard part for me is distinguishing between a RIF because the company's not making enough money, and there was a RIF here, a lot of people were let go because basically Phelps Dodge was not making enough money. Yes, sir. And then some of them fall within one or another category that gets some special Federal protection. And the problem that you have is showing me that even though a whole lot of people were being let go just because there wasn't enough money to pay them, this person was let go because of illegitimate reasons. And let me show you. It's the nexus, as Judge Thomas said, that's the hard part. I think what you're getting at is is there evidence of pretext for the jury, enough evidence in the record for pretext, and there is, and here it is. Marcus was never listed as an employee RIF through three drafts of RIF documents. I thought he was listed, but they didn't tell him until he got rid of some people under him. Companies often do that. You go fire a bunch of people in your department, and then we'll fire you. Well, sure, that's what they tell you why he wasn't listed. He wasn't listed at all, not until June when the RIF was in May. He wasn't even listed on the draft of RIF documents the day before the RIF occurred. And the only time he was listed, it said stay by his name, which means no RIF, you stay. He was given no separation date like everyone else. He was given no severance documents like everyone else. Even Swan, who was the other vice president who was terminated on the RIF, got severance documents that day, and Mr. Marcus did not. And that's at supplemental excerpt of record 999. He was given no outplacement counseling for weeks, unlike everyone else, and the company didn't follow its bylaws, which said when you're terminating a vice president, you have to have approval by the board, and there's no evidence of approval by the board. So the company didn't follow its own procedures with respect to him when they did follow its procedures with respect to everybody else, including the other vice president. All these facts are at ER 215, 127, 142, 145 to 147, and 210. The lack of uniformity in this respect is facts, evidence of pretext. Now, the defendant's going to stand up and tell you, well, so what? All these things were for his own good. We didn't want him to know about his termination, and we have reasons for this. But that creates a fact issue because there's enough evidence that the non-uniformity in how he was treated is for the jury of whether he was RIF'd or whether it's just a pretext for termination. I'd like to say a word about the religious discrimination claim, a word about retaliation, and try to save a few minutes for rebuttal. On the religious discrimination claim, what defendant is trying to do is separate out all the different areas, the different aspects of anti-Semitic events and comments, and say, well, this one, was too far away, it was too long before the RIF, the guy is gone, so what? But that's not how the court has to view the evidence. The court has to view the totality of the evidence. It doesn't matter if yearly left before. It's the whole corporate culture. Does the totality of the evidence suggest discrimination in the form of anti-Semitism? And it does. And we went over that some before. Oh, that lawyer, he must have been Jewish. Admiral Rickover, the guy who humiliated me, Jewish wrinkled bastard. Pilate, you don't like that comment? Gee, you know, I didn't even realize. Sorry, but I'm not going to follow up. I'm not going to investigate. I'll talk to yearly, but I'm not going to say anything to the board, and I won't follow up with you. You want time off for the high holy days? I'm uncomfortable with that. Why should Jews get off days that no one else gets? You want this job in the tax department? I don't know. You know, you observe the Sabbath. Complaining about pack matches to Temple Beth Israel? We're just not doing them anymore, and we never should have done them in the first place. But I'm not going to bother to answer your question about whether other organizations were similarly affected. You're at lunch with a former employee? I can't believe you're Jewish and you're still there. A jury could take a look at all of this evidence, the totality of the circumstances, and decide that there was discrimination. You can't just separate them out. A word about retaliation. We need to have evidence of protected activity, adverse employment decision, and a causal link. We have the adverse employment decision. We also have evidence of protected activity. Marcus told his supervisor that Phelps Dodge was not diverse, and it was not committed to diversity. It underrepresented females and minorities. He complained about the CEO's bigoted remark. He raised concerns about the pack match contributions to Temple Beth Israel, and when he raised that concern, he said he asked whether the company's decision affected any other organizations besides Temple Beth Israel, and that shows that he was concerned about discrimination. And he testified that he was concerned about discrimination, and that's at ER 349 and 351 and 352. So at a minimum, a reasonable juror could decide that he believed he was engaging in protected activity by making these complaints. And that is protected activity is when you oppose an employment practice that you think is unlawful. So at a minimum, a jury could decide that he believed he was engaging in protected activity. We also have the causal link. If you want to save time, you better pay attention. Yes, sir. Within one month of complaining about the CEO's remark and that the company was not committed to diversity, his pay raise was withheld. And then November, he complained about the pack match. Two months later, he receives a low evaluation, and then he was fired. There's enough evidence to get to the jury on all of these claims, and I will reserve my two minutes and 45 seconds. Thank you, counsel. Good morning, Your Honors. Ronald Stolten on behalf of Phelps Dodge. We have, or I should say that the appellant has two problems in this case, and it's what we've been dealing with really in the trial court as well as on this appeal. Number one, the extent that there are any disputes in this case, it seems to be between the plaintiff himself and his lawyers. My example is, Mr. Marcus testified, and I was the one representing the defendant in the lower court, that he is not substantially limited in any major life activity. I won't take the time now to go through the litany of major life activities. He says he's not disabled, including working and including mostly being able to work with and get along with people. Excuse me. The acoustics in here are horrible. I'm sorry. I think you said that his view was that he was not disabled. Is that what you said? His view is that he was not substantially limited in any major life activity. Yes, Your Honor. And that he, most importantly in this case, is able to work with, mostly work with and get along with other people. Now, the records show that not to be the case, however. He had difficulty getting along with other people, it seems to me. Well, actually, I disagree, Your Honor. I think that we've all worked, Your Honors, and I have worked with people who are ornery and are difficult. It doesn't mean they cannot interact with other people. And in comparison, this is a far cry from the plaintiff, for example, in McAllen v. County of San Diego, where he was truly unable to interact with people and, in fact, put himself in his home for 20 hours a day because he couldn't act with people. Mr. Marcus worked at PD, Phelps Dodge, for 13 years and progressed and was promoted his job by virtue of being in the human resource department. Well, you seem to be giving him certain accolades here. Why was he riffed? He was riffed because the job that he had no longer supported a vice president position. He also was doing the work that was already being done by what was the former director of compensation and benefits. When that person resigned two years prior to the riff, those duties were absorbed by several other people. Marcus had no job left, and that's why Mr. Pallotti decided, when he was directed, as other department managers were, to cut expenses by 35 percent, that this vice president needed to be eliminated. And that is what he told Mr. Marcus as well. I guess the problem I have with the theory that because he testifies he can interact with other people, that shows that he can, is that a lot of psychological disorders include, among them, the I could not begin to address that, Judge Kleinfeld, because that's not what was factually presented by Mr. Marcus. I thought there were medical reports that basically did present that. No. Mr. Marcus, after discovery closed, disclosed an affidavit of a Dr. Marduk who did diagnose him with OCD in 1996. According to Mr. Marcus, at that point, Dr. Marduk put him on a program of therapy and medication, after which, according to Mr. Marcus, his symptoms alleviated and he performed well. And, in fact, the very symptoms that Mr. Marcus and the plaintiff identify as symptoms of OCD, Mr. Marcus testified were symptoms that he thought served him very well in the kind of job he had to do. Thoroughness. Sure. Let me ask you about something else. There's a case that we have called Chuang v. University of California. We held in that case, as far as I can tell, that two remarks by a boss were enough to establish a genuine issue of material fact and get past summary judgment under the McDonnell-Douglas pretext analysis. One of the remarks was, two chunks. And the other remark was, you should pray to Buddha for help. I have some skepticism about wading through everything that ever happened at a workplace for nasty disclosures of bigoted attitudes, but that seems to be the law. And it's hard for me to see how to distinguish this case from Chuang. I'm happy to do that. I'm very familiar with Chang, Your Honor, or Chuang, however it is pronounced. And we do address that in our answering brief. Huge difference. The comment that the plaintiff relies on here is Doug Yearley's comment at a luncheon in December of 1999. There are several comments. There are several Jew comments. And situations where being Jewish just didn't seem material to anything. Well, if he's talking about the only one that I'm aware of, other than Yearley, is allegedly Mr. Replogle in 1998 when discussing a car accident. There's the Jew lawyer comment. Right. There's the Jew Rickover comment. Right. There's the Jew in the tax department Kaplan comment. Wait, wait. Can I address that last one? That is not a fact in this case, Your Honor. That is what happened. This is Marcus after the fact. Now this is inadmissible evidence. From his testimony, he talked about having received a file out of the clear blue, didn't know where it came from on his desk, and it related to a woman by the name of Heidi Kaplan. And he came up with this story that supposedly what Mr. Replogle said, whether Ms. Kaplan was going to be denied a job because they would not accommodate the days off that she needed for her religion. In fact, when pressed, Mr. Marcus admitted, I don't even know if Ms. Kaplan is Jewish. I don't know if she got the job. And if she got the job, I don't know if she was accommodated. It is pure speculation, as much of the facts in this case are by Mr. Marcus. With regard to Mr. Replogle's comment. That's not pure speculation. You don't know if Irving Goldberg is Jewish, but you figure he probably is. Well, that was pretty much what Mr. Marcus said when we asked him when he was trying to make this religious determination. Yes, exactly. It's a Jewish name. He said very sarcastically when I asked him, he said, well, maybe it's our little secret handshake. P.D. would not have known when I asked him. How would P.D. know at the time of the riff, which is the subject of this case, who's Jewish and who isn't? And his response was, well, it must be our little secret handshake. He didn't know who was Jewish, who was laid off, who was not laid off. And that's the issue in this case, which was the reduction in force. Coming back to Mr. Yearley's comment, I would place that in exactly the same situation as the plaintiff in Clark County School District. In Clark County School District versus Breeden, where no person, particularly a person who had spent his life in human resource management, would believe that Yearley's comment, and I'm also going to be addressing Chang here, Your Honor, that had nothing to do with employment, as did the decision-maker in the Chang case, and telling an anecdote about having been grilled by Admiral Rickover to be considered on a one-time incident as an act of discrimination or harassment. Moreover, like in Breeden, the comment and Marcus's, if you want to call it, complaint to Mr. Stodge a year before the reduction in force played no role in it. Mr. Marcus's only attempt to establish a causal link is to claim that Mr. Pallotti laughed when Mr. Yearley was telling his story. One would have to speculate, was Mr. Pallotti laughing at a funny story about having to get up and sing his college fight song, that Admiral Rickover was wrinkled, a bastard, or Jewish, or was he simply laughing at something else? The record doesn't show that, and it's incumbent upon Mr. Marcus. The laughter is their weakest, because people will tend to laugh at a boss's joke, even if it's not funny. And that's the only connection, because Mr. Pallotti did nothing that would indicate any connection between Mr. Marcus's religion and his decision to riff Mr. Marcus. And, in fact, with regard to the Yearley incident, once Marcus brought it to his attention, Mr. Pallotti did take action. Now, the plaintiff argues, well, that's not enough. He had to investigate. He didn't need to investigate. Mr. Marcus said he was offended, and he went and spoke to the person who said it. And according to Mr. Marcus, never heard another offensive word. Could you talk a little bit about the differences between how he was riffed and how other people were riffed in terms of what it said next to his name on the list and whether he was on the riff list and the board approval and all these things? Truly a red herring in this case, Your Honor. First of all, nobody's name was on a list. Of the 180 people that were riffed, up to May 16, 2001, nobody's name was on a list. The matter went to what they called the senior management team and then ultimately to the board where they presented a plan called 2001 Restructuring. Nobody's name was on the list. Moreover, because Mr. Marcus was an integral part of effectuating the riff, Mr. Pallotti testified, and they have produced no evidence to the contrary, that he did intentionally not include Mr. Marcus's name. He did not want him to know that he was being riffed because he also had a job to do. Now, whether you think that's not a nice thing to do begs the issue in this case. As far as different treatment, there are two reasons if there was different treatment that that would have occurred. One, he was a vice president. The other people were not at that officer level. He was, however, treated exactly the same as Robert Swan, the other vice president riffed, who I might add testified he was a Methodist and did not have OCD. The other difference was both Mr. Marcus and Mr. Swan, unlike the other people riffed, had specific written contracts that had been written in advance that in the event of, for example, a reduction in force or you lose your job, these are the terms and conditions under which you will be laid off. And that contract set out the terms, which was different than the other people. For example, outplacement services. Other people that were riffed that morning were given outplacement service options then and there. Mr. Marcus had in his contract the right to outplacement services, but unlike the services that were provided to the other people, his contract gave him the option of doing, getting outplacement services as he chose. Whether or not he was riffed at 9 a.m. in the morning or 6 at night, we simply would because obviously he was in the process of administering the riff. I do want to point out, because there is argument that, and I think it's because I'm going to an earlier question. Excuse me. Let me interrupt myself to come back to your question. Did I answer sufficiently your question about the Chang case? Yes. Because in that case, it was actually considering the hiring of the two Asian-Americans when the offensive comment was made to the decision-maker in the case about the hiring or non-hiring stating, and I believe the quote is, we don't need two more chinks in the department. And the person who made the decision and ultimately failed to hire the two Asian-Americans was the person who laughed. Mr. Yearley's comment was not about anybody's employment at Phelps Dodge. It was about the anecdote between him and Admiral Rickover. I think that in this case, there's a lot of argument about whether he was regarded as disabled, and I do want to point out, both in his complaint and his counsel and in the joint case. It was the Jew lawyer comment that struck me as the most interesting here, because it's less ambiguous and more gratuitous. That comment was by Mr. Replogle. Excuse me. According to Mr. Marcus, and even assuming that it would not be hearsay, Mr. Replogle was not speaking about anybody's employment at Phelps Dodge, and Mr. Replogle left not only two years before or longer before the reduction in force, he left even before Mr. Pallotti was hired. And really, finishing off on that, Your Honor, this whole idea of this corporate culture, trying to go back with hearsay anecdotes, which is inadmissible, whether we objected to that in the lower court or not, it is inadmissible hearsay evidence. Going back to when Phelps ---- But, see, the Jew lawyer comment was by Replogle. Yes. And Replogle was gone. 1998. 98. And I would point out, Your Honor ---- And Yearley was hired. Yearley left in mid-2000, May of 2000. And Yearley is Marcus's boss. No. No. Mr. Pallotti was Marcus's boss. Mr. Pallotti was the decision-maker. Mr. Yearley was the chairman of Phelps Dodge until he retired in May of 2000. And he is the person who made the Admiral Rickover comment. It is interesting to note, however, that in this alleged culture of anti-Semitism that existed going back, if you believe the plaintiff's spin, to when Phelps and Dodge were wielding pickaxes, that Mr. Marcus was promoted to Vice President of Human Resources in January 1998. That is when Mr. Replogle left. The only thing that occurred after that that ties into religion is Mr. Yearley's comment in December 1999, 17 months before the riff. There is argument that this is a regarded-as case, and I do want to point out that nowhere in the complaint did the plaintiff plead this as regarded-as. The Plaintiff's Counsel even admitted to the ---- to Judge McNamee that she pled it as a disability case, not a regarded-as case, and she accurately pointed out, just because Mr. Marcus may subjectively believe that somebody regarded him as disabled doesn't make it so, and she said she thinks he's in denial. So could you back up for a second? There's something that you've said two or three times that confused me about hearsay. If Marcus's boss tells him that he heard somebody else make an anti-Semitic comment, I don't understand the hearsay theory. It seems to me that the anti-Semitic comment is not being introduced for its truth. The only relevance is whether it was said. The boss is not testifying that it was said true, but in the context of the hearsay  truth. In that context, it's probably within the admissions exception. So I'm not sure I follow what you're saying about hearsay. If it's hearsay, we disregard it. That's ---- Well, I'm drawing a distinction. I think what I said with regard to Mr. Rapolo was even assuming that it was not hearsay, it is not material, even if he said it. When you say even assuming it was not hearsay, I start thinking, well, was it hearsay? And I'm confused about what your theory is. Because if it's hearsay, it's not part of our case that we have to consider. It's not cognizable evidence under Rule 56. And we would contend it's not part of the case anyway because Mr. Rapolo was not the decision-maker and was gone more than two years before the event. I must have not made myself clear. Okay. What's hearsay that we should not regard as evidence under Rule 56? The anecdotes of corporate culture of discrimination at Phelps Dodge, which Mr. Marcus testified, came from somebody testifying that if he spoke Spanish in school, he was slapped. That at some time in the ancient past, some people referred to Phelps Dodge as Presbyterian copper. That he heard that there was separate housing for people back in the days of yore. These are all hearsay anecdotes. And that's our point. Because the religious discrimination, if I'm understanding the plaintiff's argument, is twofold. I'm Jewish and there's a corporate culture. I believe there's a corporate culture because of these hearsay anecdotes. With regard to ‑‑ I need to just address very briefly in the time I have left this, the retaliation claim. The plaintiff alleges that he must have been retaliated against because of three things. I want to bring up the very first one. He claims he wrote an e‑mail complaining about something called the Pack Match Program. If the court reviews the record at ‑‑ if I can find this. Excuse me. It is in ‑‑ excuse me, I'm not finding it right now. He testified in his ‑‑ here it is. Complaint at paragraph 15, which is at ER, page 5. He maintained that by excluding religious organization, P.D. was in violation of election laws. That is what his complaint says. That is what he has testified. It has now been swung in by saying election and other laws that somehow P.D. should have understood that he was talking about Title VII. But that is not what his complaint was. Did not engage in that protected activity. With regard to having filed a report about alleged underutilization, he did that only at the direction of Mr. Pallotti. Mr. Marcus simply did nothing when he was the one in charge of H.R. about diversity and affirmative action because P.D., everybody agrees, is under no legal obligation to do that. It was Pallotti who instructed him to do it. It was ‑‑ the report he wrote was at Pallotti's direction. And because of that, he's claiming now that because Pallotti ordered me to do this and I did it, somehow Pallotti retaliated against me because I did what he told me to do. And that is simply not accurate. And the last one was, and we've spoken at great length about Yearley's comment. I see my time is up. There's so much to say. But I will say that, in conclusion, that this is a case that really is a creation of Stewart Marcus drawing conclusions that are not based on admissible evidence in this case, in the record. Thank you. Thank you, counsel. Thank you, Your Honor. I would like to just make a couple of quick points. The reason Mr. Marcus did nothing about diversity before Mr. Pallotti came is because he did not have any authority to do that. It was not in his job description. He didn't ‑‑ he wasn't required to, and he couldn't as a matter of job issue. That's in the record. The differences in the RIF, counsel indicated that no one's name was on the list. I'd refer you to ER 210. Here is the list with a whole bunch of names on it, beside which some say leave and some say stay. And there are names on this list. It's ER 210. On the Kaplan matter, Mr. Marcus testified. What matter? The Kaplan matter. Mr. Marcus testified that he saw this material in the file. It doesn't matter if she was or wasn't discriminated against or Jewish. The issue is it's one more in a series of events that show anti‑Semitic discrimination. We're not making a claim for Ms. Kaplan. It just shows that Judaism was an issue where it shouldn't have been. The court asked counsel why he was RIF'd, why was Mr. Marcus RIF'd, if he was such a good employee, and the answer was because his job duties changed. But both Mr. Marcus and Mr. Pallotti testified that the reason they weren't keeping him on and finding him alternative employment was because he couldn't get along with others, and that is exactly because of his OCD. And so that is an issue for the jury. Defendant would like to say that's why he was terminated, but the fact is that the facts are disputed and those facts are for the jury. The court asked, well, he was progressed and he was promoted and he was such a good ‑‑ he was a good employee. All this shows is that he was qualified to do his job, not that he wasn't disabled or regarded as disabled. He was a very ‑‑ he's a very smart guy, he's very analytical, but he has this issue that needs to be addressed in a way other than termination. He did testify that he can eat and walk and breathe and use a computer. The fact that he can do those things doesn't mean that he's not disabled. I've got a question I have to put to you. It looks to me ‑‑ we don't talk about these cases in advance. I have no idea how it looks to my colleagues. Yes, sir. It looks to me as though people who work with Marcus, a lot of them found him kind of unpleasant. It is characteristic of mild personality disorders that they make people socially unpleasant to those around them. It also looks as though the company didn't know that there was some sort of accommodation he needed because of a personality disorder. There's some kind of medical diagnosis there. They don't know. And on the Jewish thing, it looks as though there were people with anti‑Semitic attitudes around the company, but the fact of the matter is they were getting rid of a lot of people and they got rid of a guy that some people found unpleasant. I don't think that adds up to a case, or at least I don't think it would under Chuang, but I'm not sure. That's my kind of understanding of the whole gestalt here. It's the totality of the circumstances. And certainly they have excuses for what they did. And, yes, there's anti‑Semitic behavior that shows discrimination, but, you know, it's not ‑‑ I don't know. That's an issue for the jury, Your Honor. There is enough evidence of a culture of discrimination where he was complaining about lack of diversity, he complained about the pack match, he was not given his raise two months later, he complained again about diversity in 2000, about the pack match, and then he was not promoted, he was not given his raise, and he was terminated. There's enough there for the jury to decide this issue. Your other question? I don't want to go through the whole thing again. I just wanted to give you a chance to address that. Your Honor, the bottom line is that we don't want the court to make the same mistake as the defendant and the district court in deciding these factual issues in defendant's favor.  Thank you, counsel. And Marcus v. Phelps Dodge is submitted.
judges: Thompson, Kleinfeld, Thomas